## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DOUGLAS G. CROSEN JR.,

               Plaintiff,

     v.

TROOPER SHARON PALMER, et al.,

               Defendants.

CIVIL ACTION NO. 3:21-CV-00791

(MEHALCHICK, J.)

## MEMORANDUM

This action was commenced upon the filing of a complaint by Plaintiff Douglas G. Crosen Jr. ("Crosen") against Defendants Pennsylvania State Police Trooper Sharon Palmer ("Trooper Palmer"), Colonel Robert Evanchik ("Colonel Evanchik") (collectively, "PSP Defendants"), and Supervisors Jane/John Doe (collectively, "Defendants"). (Doc. 1). Before the Court is a motion for summary judgment filed by PSP Defendants. (Doc. 50). For the following reasons, PSP Defendants' motion for summary judgment (Doc. 50) will be **DENIED in part** and **GRANTED in part.**

## I.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   FACTUAL BACKGROUND

The relevant factual background is as follows.[1] On July 2, 2018, a five-year-old juvenile female referred to herein as "RM" was taken to Wayne Memorial Hospital in Honesdale Pennsylvania and seen for ankle pain. (Doc. 51, ¶ 6; Doc. 71-1, at 7). A urinalysis

---

[1] Unless otherwise indicated, this factual background is taken from the parties' statements of material facts, responses thereto, and supporting exhibits. (Doc. 51; Doc. 67; Doc. 71).

revealed the presence of sperm in RM's urine. (Doc. 51, ¶ 7; Doc. 71-1, at 7, 9). A medical professional notified Wayne County Children & Youth Services ("WCCYS"). (Doc. 51, ¶ 8; Doc. 71-1, at 6-7). WCCYS submitted a "Report of Suspected Child Abuse to Law Enforcement Official" to the Wayne County District Attorney's Office. (Doc. 51, ¶ 8; Doc. 71-1, at 6-7). RM's treating physician also called the Children's Advocacy Center of Northeastern Pennsylvania ("CAC") to report the urinalysis results. (Doc.51, ¶ 9; Doc. 71-1, at 11). The CAC subsequently completed an evaluation and a report in the presence of the Wayne County District Attorney's Office. (Doc. 51, ¶¶ 11-15). The Wayne County District Attorney's Office then notified the Pennsylvania State Police of the possible child sexual assault and requested it handle the investigation. (Doc. 51, ¶15; Doc. 71-1, at 5). On July 9, 2018, Trooper Palmer was assigned to the case along with Wayne County District Attorney First Assistant Deb Rothenberg ("ADA Rothenberg"). (Doc. 51, ¶¶ 19, 22).

During her investigation, Trooper Palmer pursued serology and DNA analysis reports to determine who was RM's abuser. (Doc. 51, ¶¶ 37, 45, 51; Doc. 71-1, at 28-32). These reports never linked the abuse to Crosen. (Doc. 51, ¶¶ 37, 45, 51; Doc. 71-1, at 28-32). The reports did reveal, however, that RM was not abused by a family member. Trooper Palmer, ADA Rothenberg, and RM's mother, Kristina M. ("Kristina"), contracted licensed professional counselor Paula Brust ("Brust") to pursue counseling sessions with RM. (Doc. 51, ¶¶ 27-29; Doc. 71-1, at 21-22). The goals of the sessions were "furthering the investigation" and "determin[ing] who has assaulted said minor child [RM]." (Doc. 51, ¶¶ 27-29; Doc. 71-1, at 21-22). The contract required Brust to "speak with the child using known treatment methods for the main purpose of preparing the minor child to disclose…who has assaulted her and to facilitate such a disclosure." (Doc. 51, ¶¶ 27-29; Doc. 71-1, at 21; Doc. 67-3, at 5).

2

Over the next several months and into the new year, Brust conducted counseling sessions with RM. (Doc. 51, at 8-16; Doc. 67-5; Doc. 67-6). During these sessions, RM provided numerous names of who she thought her abuser might be and conflicting details regarding the assault. (Doc. 67, at 19; Doc. 67-5; Doc. 67-6). RM named Caydence Kittwack, Cayden Daydonce, Carlo, Keith, David, Zayden, and Doug as her abuser. (Doc. 67, at 19). RM also gave contradictory descriptions about what her abuser looked like. (Doc. 67-5; Doc. 67-6). As for where the inciden occurred, RM suggested that she was assaulted at her house in her mother's bed, in her own bed, in Doug's living room, and in Doug's "the bride room." (Doc. 67-5; Confidential Interview of RM at 22:27). RM also shared some unrealistic details with Trooper Palmer and Brust about the incident, including that a creepy song was playing during the abuse that scared her. (Confidential Interview of RM at 21:00). However, during a recorded interview with Trooper Palmer,[2] RM admitted that she lies when she does not know what to say. (Confidential Interview of RM at 18:39).

During a couple of her sessions with Brust, RM spoke about a man named Doug who showed her his "Bride Room." (Doc. 51, at 9; Doc. 71-1, at 56). Brust's session notes indicate that Kristina told Brust that RM "keeps bringing up the neighbor's name Doug," understood by Kristina to be Doug Crosen. (Doc. 51, at 9; Doc. 71-1, at 56). Almost a year into the investigation, Kristina underwent polygraph questioning. (Doc. 51, ¶ 57; Doc. 71-1, at 43-44). During the questioning, Kristina stated that RM told her that Doug had shown her a room in

---

[2] While the video exhibit of the interview that was submitted by counsel is not labeled and Trooper Palmer does not identify herself in the recording, in the context of the additional materials submitted by counsel the Court understands the interview to be conducted by Trooper Palmer, as she refers to herself as a police officer and RM demonstrates familiarity with her. (Confidential Interview of RM).

his house which he referred to as the "Bridal Room" and that the Bridal Room contained "a bed, teddy bear and wedding gown[.]" (Doc. 51, at 19; Doc. 71-1, at 43-44). Kristina also reported that when she asked RM what happened in the Bridal Room, RM told her "he put me on the bed and put his boy parts 'on or in' her girl parts." (Doc. 71-1, at 43-44). After alerting the Wayne County District Attorney's Office of this information, Trooper Palmer conducted an audio and video-recorded interview of Kristina. (Doc. 51, ¶ 57). Afterwards, Trooper Palmer, ADA Rothenberg, and Wayne County District Attorney Patrick Robinson made the decision to file charges against Crosen. (Doc. 51, ¶ 58; Doc. 71-2, at 4). Trooper Palmer prepared and filed an affidavit of probable cause with the Magisterial District Judge Ronald Edwards. (Doc. 51, ¶ 60; Doc. 1-2, at 8-13).

In its entirety, the affidavit of probable cause reads:

Your affiant has been a member of the Pennsylvania State Police Station since November 1996. In December 2005, I was transferred to the Criminal Investigation Unit as a Criminal Investigator. Since that time, I have had a multitude of trainings and instructions on Child Abuse Investigations and Interviewing. The Investigations that have been assigned to me have consisted of hundreds of interviews with victims, witnesses, and perpetrators. Many forms of investigative tools, including search warrants, have been utilized in my investigation to develop a suspect(s).

On 07/02/2018 the victim, a five-year-old juvenile female, was taken to the doctor's office by her mother for ankle pain. The victim also had a fever, and her urine was obtained by the doctor's office to determine the cause of the fever. The doctor's office indicated the presence of blood in the child's urine and the urine was sent to Wayne Memorial Hospital for further testing per the protocol of the doctor's office. The results of the urinalysis from Wayne Memorial Hospital were received on 07/03/2018 and showed a presence of semen in the victim's urine. Later, the presence of semen was further confirmed by an independent examination of the urine sample at the Pennsylvania State Police Crime Lab. Dr. Michael Rogan, Medical Director of the Children's Advocacy Center of Northeastern Pennsylvania in Scranton, was consulted on this matter and indicated that if the sperm were alive the incident would have had to have occurred within the previous 72 hours, whereas if the sperm were not alive, conservatively seven days at a maximum. Wayne Memorial Hospital was

4

unable to determine whether the sperm were alive or not at that time. Dr. Rogan also opined, in his professional opinion that the only reason for a child to have semen in their urine is from sexual contact.

The findings were reported to Childline by the doctor's office. Wayne County Children and Youth was notified, and the victim's parents informed. A forensic interview and physical exam were scheduled for the victim on 07/03/2018 at the Scranton Children's Advocacy Center. The victim was interviewed but did not make any disclosure of abuse at that time. The physical exam showed a white milky discharge from the urethra and significant redness on the child's hymeneal tissue and fossa.

I interviewed a number of people to attempt to determine the identity of the perpetrator and learned that on 06/30/2018 (two days prior to the victim's appointment at the doctor's office), at dinner time a BBQ was held at the victim's home [REACTED]. The BBQ lasted until well after dark. A next-door neighbor, Doug CROSEN, was present.

According to the victim's mother, the victim has been at the CROSEN residence many times, sometimes with her brothers and sometimes alone. The victim's mother indicated that CROSEN came to the residence next to her home to do some work on it for his Aunt in early June, stayed there for a few weeks, and left shortly after the victim was assaulted. The victim's mother stated that during the 7 days prior to the semen being found in the victim's urine, no other males were present at the residence CROSEN was residing other than CROSEN. The victim's mother specifically recalls the victim being unsupervised and alone in CROSEN'S residence for a period of time during the relevant timeframe.

The urine sample from the victim was sent to the Pennsylvania State Police Crime Lab. On 08/31/2018 the Serology report was received from the lab indicating the Spermatozoa were identified in the urine sample from the victim. A known DNA reference sample from the victim was sent to the lab to develop a DNA profile for comparison.

On 10/29/2018 the DNA analysis was received. Among items tested, a DNA profile from an unidentified individual, consistent with a male, was developed from the sperm fraction of the victim's urine swab. This DNA profile does not match any known profiles in the CODIS system.

The Wayne County Multi-Disciplinary Task Force entered into a contract with a licensed professional counsellor and the victim's mother wherein the counsellor was hired by the Team to talk with the victim several times in an effort to bring the victim to disclosure, and the counsellor would then report back to the Team with a summary of each session. On 8/20/18 the victim

related [sic] to the counselor that her neighbor "Doug" has a "bride room" in his house. When asked what a "bride room" is, the 5-year-old victim indicated that CROSEN told her it is a room where people go after they get married. The victim said she has been in Doug's bride room before and there was a teddy bear and a wedding dress in there.

In subsequent sessions the child indicated immense fear of her perpetrator and refused to disclose the identity of the perpetrator. The victim indicated to the counsellor that she was afraid the man who did this was going to kill her and the victim told the counsellor her perpetrator told her he'll keep switching his spots to hide and he will find her (the victim) and kill her, he said he will kill the cops too because he has a gun in his pocket. The victim then described seeing the gun in the man's pocket as a black shiny gun. The victim indicated to the counsellor that she was afraid her perpetrator had microphones everywhere and would hear her if she told on him. In one particular session with the counsellor on 11/5/18 the victim stated that "Keith" did it, and "I know Doug's first name is Keith". In another session with the counsellor on 10/22/18 the victim told the counselor that the person who did this to her "put his peepee on my peepee" and poop came out of his peepee.

According to the victim's mother as well as the victim's 2 teen-aged brothers, there is no indication that anyone named Keith had access to this child during the relevant timeframe.

Throughout the course of this investigation, the victim's mother, Kristina MATTHYS, was asked to provide a list of all male individuals who had or may have had unsupervised contact with the victim within the seven days prior to the victim's doctor appointment where the semen was found. Kristina MATTHYS provided a list of all male individuals that had or may have had unsupervised contact with the child victim during the relevant time frame. Since the incident occurred during the summertime, the child was not in school and was supervised by her mother the majority of the time. The victim's mother does not work outside the home and is the primary caregiver for this victim. All individuals named by Kristina Matthys were blood related family members and Doug CROSEN. [sic] DNA samples were obtained from Kristina MATTHYS and paternal grandmother Sandra MCDEVITT. When the DNA analysis was complete, Kristina MATTHYS and Sandra MCDEVITT'S DNA samples were compared to the known sample from the suspect. PTC Laboratories, 300 Portland Street, Columbia, Missouri 65201, independent from the Pennsylvania State Police Lab, was consulted, and compared the DNA profiles of Kristina MATTHYS and Sandra MCDEVITT to the suspect's DNA for familial testing. PTC Laboratories was able to confirm that the suspect DNA did not come from a blood related family member of the victim, did not come from a blood related family member of Kristina Matthys, and did not come from a blood related family member of Sandra McDevitt. Mr. Crosen

6

is the only known male individual to have or may have had unsupervised contact with this victim within the relevant time frame that has not been definitively ruled out by DNA at this time. Numerous times the counsellor went through the individuals on the list provided by the victim's mother with the victim and asked her if any of the people on the list was the person who assaulted her and the victim would answer either no or I don't know.

According to Kristina Matthys, as well as the two male juveniles in the home (the victim's blood related brothers, who have both been ruled out by DNA as the perpetrators), there was no indication whatsoever of an intruder in or around their home during the relevant timeframe. The family advised they have large dogs that would have alerted them of an intruder.

On May 2, 2019, the victim's mother came to PSP to be interviewed regarding the list of people she had stated had or may have had unsupervised contact with the victim during the relevant timeframe. That interview is audio and video recorded. During that interview, the victim's mother recalled a conversation with the victim sometime around August of 2018 wherein the victim told her mother that the thing that happened occurred in the "bridal room", there was a wedding dress in the room without plastic on it, the victim was on the bed in the "bridal room" and the man took out his "boy parts" and put it in or on her girl parts. The victim again was unable or unwilling to name her perpetrator at that time.

In summary, the five-year-old victim is unwilling or unable, due to fear, to identify her assailant. To date, the victim has not been able to directly identify her perpetrator. However, the victim has been able to state that the male who did this did it in the bride/bridal room on the bed, took out his "boy parts" and put them in or on her "girl parts". The victim has been able to identify the bride/bridal room as being in the residence occupied by Doug CROSEN, the victim stated CROSEN is the one who told her about the bide/bridal room, and the victim has stated that CROSEN told her the bride/bridal room is where people go after they get married. The victim told her counsellor the person who did this is named "Keith" and stated "I know Doug's first name is Keith." In my experience, it is known that child victims of sexual assault often express fear in naming their perpetrator, especially when threats of harm are involved in the assault, and child molestation victims will often disclose the assault in fragments and/or indirectly so as to refrain from having to expose themselves to the promised retribution. Additionally, as outlined above, all other potential suspects other than CROSEN who had or may have had unsupervised contact with the victim during the relevant timeframe have been definitively ruled out by DNA testing. According to the victim's mother, the victim had unsupervised contact in CROSEN'S residence with Doug CROSEN during the relevant timeframe. According to the victim 's mother, CROSEN was the only male individual in that residence during the relevant time frame. ln my experience,

7

it is known that child perpetrators often use ruses to lure a child and entice a
child to not fear them or to intimidate the child into doing what the suspect
wants the child to do. In this case, the victim disclosed that CROSEN showed
her a room in his house that he identified as a "bride room." The victim further
explained that CROSEN told her that the bride room is where people go after
they get married, and there was a teddy bear in the bride room. The victim also
disclosed the assault occurred in the bridal room. Wherefore, I respectfully
request this search warrant be approved to obtain the DNA from Douglas
George CROSEN, Jr.

(Doc. 1-2, at 8-13).

Judge Edwards approved the charges and issued an arrest warrant for Crosen. (Doc. 51, ¶ 60;

Doc. 71-1, at 48-51). Through the involvement of several states' police forces, Crosen was

located in Wellfleet, Massachusetts and arrested by the Wellfleet Police Department. (Doc.

51, at 22-24). Crosen was then extradited from Massachusetts to Pennsylvania, where he was

arraigned. (Doc. 67, at 18; Doc. 71-8). At Trooper Palmer's urging, bail was set at one million

dollars. (Doc. 67, ¶¶ 79-80; Doc. 67-1, at 42). Crosen was subsequently incarcerated for twelve

days as Trooper Palmer pursued a DNA analysis. (Doc. 67, at 18; Doc. 67-1, at 44). Crosen's

DNA was not a match. (Doc. 67, at 18). Accordingly, Crosen was released and Defendants

dropped the charges against him. (Doc. 67, at 18; Doc. 67-1).

   B. PROCEDURAL BACKGROUND

   Crosen initiated this action by filing a complaint against PSP Defendants on May 3,

2021. (Doc. 1). Therein, he alleges the following counts: Count I; Unlawful Seizure/False

Arrest under 42 U.S.C. § 1983 against Trooper Palmer; Count II; False Imprisonment under

42 U.S.C. § 1983 against Trooper Palmer; Count III; Malicious Prosecution under 42 U.S.C.

§ 1983 against Trooper Palmer; Count IV; Reckless Investigation in violation of Fourteenth

Amendment Due Process under 42 U.S.C. § 1983 against Trooper Palmer; Count V;

Excessive Bail under the Eighth and Fourteenth Amendment under 42 U.S.C. § 1983 against

Trooper Palmer; Count VI; Supervisory Liability/Policymaker Liability under 42 U.S.C. § 1983 against Colonel Evanchik and Other John/Jane Doe Supervisors; and Count VII State Constitutional Violations against all Defendants. (Doc. 1, at 32-91).

On October 6, 2023, PSP Defendants filed a motion for summary judgment, a statement of facts, and a brief in support.[3] (Doc. 50; Doc. 51; Doc. 52). With leave of Court, Crosen filed his brief in opposition and answer to PSP Defendants' statement of material facts along with accompanying exhibits on January 12, 2024. (Doc. 66; Doc. 67). Accordingly, the motion is ripe for discussion.

## II.   LEGAL STANDARDS

### A.   MOTION FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions,

---

[3] PSP Defendants filed their accompanying exhibits on March 18, 2024. (Doc. 71).

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential).

B. SECTION 1983

Crosen asserts federal civil rights claims pursuant to 42 U.S.C. § 1983, which provides

a private cause of action for violations of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a 42 U.S.C. § 1983 claim, a plaintiff must demonstrate that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

## III. DISCUSSION

### A. WHETHER OFFICER PALMER IS ENTITLED TO QUALIFIED IMMUNITY

The parties dispute whether Trooper Palmer is entitled to qualified immunity. (Doc. 52, at 8; Doc. 66, at 9-10). Crosen argues Trooper Palmer is not entitled to qualified immunity because the "false statements and material omissions in [her] sworn affidavit" create a question of material fact as to whether Trooper Palmer had probable cause to arrest Crosen. (Doc. 66, at 9-11). PSP Defendants argue that "in the event Palmer lacked *de jure* probable cause, she nonetheless had arguable probable cause, [and thus] she is entitled to qualified immunity." (Doc. 52, at 8).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right,

11

and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal citations omitted). "[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft*, 563 U.S. at 735. A clearly established right is one that is so apparent that "every reasonable official would understand that what he is doing is unlawful." *Dennis v. City of Philadelphia*, 19 F.4th 279, 288 (3d Cir. 2021) (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (internal quotations omitted)). The immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 735 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Because the qualified immunity doctrine provides the official with immunity from suit, not simply trial," the Court is obliged to address the defense "at the earliest possible stage of the litigation." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). At the summary judgment stage, the burden of persuasion is on the party asserting the qualified immunity defense. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Accordingly, PSP Defendants must show "that there [is] no genuine dispute of material fact to refute their contention that they did not violate [Crosen's] constitutional rights as he asserted them, or show that reasonable officers could not have known that their conduct constituted such a violation when they engaged in it." *Halsey*, 750 F.3d at 288.

### 1. Qualified Immunity for Crosen's Prosecutorial Claims

Crosen's prosecutorial claims, which include his claims for malicious prosecution, false arrest, and false imprisonment, hinge on whether Trooper Palmer had probable cause to arrest him. In cases implicating an arrest pursuant to a warrant issued by a magistrate or judge,

qualified immunity will not be extended if "no reasonable officer could have believed there was probable cause despite the existence of the warrant." *Fiore v. City of Bethlehem*, 510 F. App'x 215, 220 (3d Cir. 2013). Accordingly, "an arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability[]." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000); *see Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997). While "[a]n officer is not required to exhaust every potential avenue of investigation before seeking to obtain a warrant," they cannot act recklessly or purposefully disregard the truth in obtaining an arrest warrant. *Morgan v. Pennsylvania*, No. 4:23-CV-00872, 2023 WL 6461245, at *9 (M.D. Pa. Oct. 2, 2023); *Wilson*, 212 F.3d at 787. "If a police officer submits an affidavit containing statements he [or she] knows to be false or would know are false if he [or she] had not recklessly disregarded the truth, the officer obviously failed to observe a right that was clearly established. Thus, he [or she] is not entitled to qualified immunity." *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993). Further, "a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Wilson*, 212 F.3d at 787-88.

Because Trooper Palmer's affidavit of probable cause was approved by a Magistrate Judge, she is entitled to qualified immunity unless she "knowingly and deliberately, or with a reckless disregard for the truth, made false statements and omissions that create a falsehood in applying for a warrant." *Wilson*, 212 F.3d at 786-87 (citing *Sherwood v. Mulvill*, 113 F.3d 396, 399 (3d Cir. 1997*)); see Pinkney v. Meadville, Pennsylvan*ia, 95 F.4th 743, 748-49 (3d Cir. 2024); *see also Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) ("Thus, a court faced with a claim that an arrest warrant contains false assertions and omissions must first determine

13

whether the officer made those false assertions or omissions either deliberately or with reckless disregard for their truth."). Under these circumstances, the Court must conduct a "three-step procedure ... First, we assess the evidence the plaintiff asserts was recklessly omitted from the affidavit. Next, we reconstruct an affidavit that includes any recklessly omitted information. And finally, we assess the materiality of the omitted information to the probable cause determination." *Thompson v. City of Williamsport*, No. 4:22-CV-01159, 2024 WL 1747645, at *8 (M.D. Pa. Apr. 23, 2024).

The Court thus begins its inquiry with determining whether Trooper Palmer deliberately included false information or made material omissions in her affidavit of probable cause. *Thompson*, 2024 WL 1747645, at *8. Because the parties do not cite to anything in the record that indicates Trooper Palmer acted deliberately, the Court must determine whether her omissions and false statements were made with reckless indifference to the truth. *Thompson*, 2024 WL 1747645, at *8. To determine reckless indifference to the truth, the Court looks to "whether the officer withheld a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993); *see Reedy*, 615 F.3d at 214 (quoting *Wilson*, 212 F.3d at 788)( "'[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know' in making a probable cause determination."). "Assertions can be made with reckless disregard for the truth 'even if they involve minor details—recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth.'" *Reedy*, 615 F.3d at 213 (quoting *Wilson*, 212 F.3d at 788).

14

The information Crosen alleges Trooper Palmer recklessly omitted from her affidavit is as follows. First, Crosen suggests Trooper Palmer recklessly omitted the names of six additional suspects RM mentioned over the course of Trooper Palmer's investigation. (Doc. 66, at 14-15; Doc. 67, at 19-21). Next, Crosen suggests Trooper Palmer recklessly omitted descriptions RM provided of her assailant which do not match Crosen. (Doc. 66, at 14-15; Doc. 67, at 19-21).  Next, Crosen suggests Trooper Palmer recklessly omitted that RM stated six times that the abuse happened in her home, not at Crosen's. (Doc. 66, at 14-15; Doc. 67, at 19-21). Crosen also submits Trooper Palmer recklessly omitted the fact that RM told Brust that Crosen had never been to RM's residence, and that Crosen had never hurt her. (Doc. 66, at 14-15; Doc. 67, at 19-21). Crosen believes that Trooper Palmer should have also included the fact that she was unable to link any DNA evidence to Crosen and that she never interviewed Crosen before arresting him. (Doc. 66, at 14). Lastly, Crosen asserts that Trooper Palmer recklessly omitted the fact that when RM told Brust she had been in Doug's bride room, RM also stated that she was there with her brother and her cousin. (Doc. 67, at 20). Further, Crosen argues that Trooper Palmer should have included the fact that RM "made no allegation of any impropriety by Crosen" during the that conversation. (Doc. 67, at 20).

As for Trooper Palmer's false statement, Crosen provides that Trooper Palmer falsely stated in her affidavit that, "there is no indication that anyone named Keith had access to this child during the relevant timeframe." (Doc. 67, at 20-22). As Crosen sees it, the record supports Trooper Palmer knew this information was false because her deposition testimony suggests she was informed that a man named Keith *did* have access to RM during the relevant period and that RM had told her counselor that a man named "Keith" had come to her house while camping outside with her uncle Patrick. (Doc. 67, at 20-22). This information seems

especially important considering Trooper Palmer included the fact that RM stated, "I know Doug's first name is Keith," in her affidavit. (Doc. 67, at 20). Crosen takes issue with Trooper Palmer's failure to reiterate that Crosen's first name is not Keith in her affidavit. (Doc. 67, at 20).

Even beyond the material omissions and false statements cited by Crosen, which he argues "are too lengthy to set forth" fully in his brief, a close review of the record shows additional deficiencies with Trooper Palmer's affidavit. (Doc. 66, at 16). Most troubling involves a statement RM made to Trooper Palmer during an interview. (Confidential Interview of RM at 18:39). RM told Trooper Palmer she sometimes lies when she does not know what else to say. (Confidential Interview of RM at 18:39).

Reviewing the facts in a light most favorable to Crosen, "a reasonable person would know that a magistrate would want to be given the above information when deciding if there is probable cause to arrest for the crimes charged, as the information sheds critical light on the reliability of the statements made by [RM]." *Round v. City of Philadelphia*, No. CV 19-3513, 2022 WL 2916681, at *13 (E.D. Pa. July 22, 2022). This includes but is not limited to the discrepancies between RM's descriptions of her abuser and Crosen's appearance, the fact RM named *seven* different individuals as her abuser, the fact RM said Crosen did not hurt her, the fact RM said the abuse happened in several different locations, the fact RM said the abuse happened in her home on six occasions, the fact RM admitted to sometimes lying when asked about the abuse, and the fact that another individual RM named as a potential abuser, Keith, had access to RM in her home, especially considering RM's statement that "Doug's first name is Keith." *See Fallen v. City of Newark*, No. 15CV2286 (EP) (JBC), 2023 WL 4118142, at *12 (D.N.J. June 22, 2023) (finding a discrepancy in appearance between the suspect and the

16

witness's descriptions of the perpetrator to be "an exculpatory fact omitted from [the officer's] affidavit in reckless disregard for the truth because it is a fact that the judge would have wished to know."); *see also United States v. Brown*, No. 2:08-CR-299, 2011 WL 3678682, at *13 (W.D. Pa. Aug. 19, 2011), *aff'd*, 534 F. App'x 132 (3d Cir. 2013) (finding the exclusion of an additional suspect to be exculpatory information that a reasonable person would know a Magistrate Judge would expect to be considered in the affidavit for probable cause); *see also Tereo v. Smuck*, No. 1:16-CV-1436, 2017 WL 2080193, at *5 (M.D. Pa. May 15, 2017) (stating that a reasonable person would know a magistrate judge would want to be informed of all "plainly exculpatory" information). Accordingly, the Court finds Trooper Palmer authored her affidavit of probable cause with reckless disregard for the truth. (Doc. 71-7, at 4-6).

Because the Court has concluded Trooper Palmer recklessly failed to include material information and made false statements in her affidavit of probable cause, the Court must now reconstruct the affidavit including the recklessly omitted information and corrected false statements. *See Thompson*, 2024 WL 1747645, at *8; *see also Tereo*, 2017 WL 2080193, at *5-6. The reconstructed affidavit in relevant part is as follows:

> The Wayne County Multi-Disciplinary Task Force entered into a contract with a licensed professional counsellor and the victim's mother wherein the counsellor was hired by the Team to talk with the victim several times in an effort to bring the victim to disclosure, and the counsellor would then report back to the Team with a summary of each session. On 8/20/18 the victim related to the counselor that her neighbor "Doug" has a "bride room" in his house. When asked what a "bride room" is, the 5-year-old victim indicated that CROSEN told her it is a room where people go after they get married. The victim said she has been in Doug's bride room before and there was a teddy bear and a wedding dress in there. **At this time, RM also stated that she was there with one of her brothers and a cousin, and made no allegation of any impropriety by CROSEN.** (Doc. 67-5, at 2). **CROSEN has not been interviewed at any point throughout this investigation. There has been no DNA evidence obtained linking CROSEN to the crime.**

17

In subsequent sessions the child indicated immense fear of her perpetrator and refused to disclose the identity of the perpetrator. The victim indicated to the counsellor that she was afraid the man who did this was going to kill her and the victim told the counsellor her perpetrator told her he' II keep switching his spots to hide and he will find her (the victim) and kill her, he said he will kill the cops too because he has a gun in his pocket The victim then described seeing the gun in the man's pocket as a black shiny gun. The victim indicated to the counsellor that she was afraid her perpetrator had microphones everywhere and would hear her if she told on him. In one particular session with the counsellor on 11/5/18 the victim stated that "Keith" did it, and "I know Doug's first name is Keith". **CROSEN's first name is not Keith**. (Doc. 67-1, at 30). **On September 10, 2018, RM was again asked who touched her. RM responded that "it might be someone who was camping outside." RM then stated that Patrick [her uncle] was camping outside and "Keith", Patrick's friend came over." (Doc. 67-3, at 8). RM then identified her rapist as David, and then admitted there was no David. (Doc. 67-1, at 30-31). RM then identified her rapist as Zayden. (Doc. 67-1, at 30-31). RM also provided a description of her abuser that did not match CROSEN. (Doc. 67-1, at 31). At one point, RM told her counselor her assailant had a man bun, which CROSEN does not.**

In another session with the counsellor on 10/22/18 the victim told the counselor that the person who did this to her "put his peepee on my peepee" and poop came out of his peepee. **RM disclosed during this interview that the rapist who did this was "Carlo" who she had never seen before. (Doc. 67-1, at 28; Doc. 67-5, at 7). RM also stated that the rape happened in her house. That she was "sure" that it happened in her house. (Doc. 67-1, at 27-28). RM again told her counselor, as she did on October 9, 2018, that she was "sure" it happened in her house. (Doc. 67-1, at 27-28). This was the fourth time RM said the rape occurred in her house. (Doc. 67-5, at 7). In totally, RM has told her counselor six times that the rape occurred in her home including in her bed and her mother's bed.**

**During a 11/26/18 interview, RM twice told her counselor that CROSEN was not her assailant. (Doc. 67-3, at 23). RM also told her counselor that CROSEN did not hurt her. (Doc. 67-3, at 21).**

**12/10/2018, MATTHYS told the counselor that her brother -in-law Patrick had a friend named Keith. (Doc. 67-3, at 27-28). Keith had access to RM in her home.**

According to the victim's mother as well as the victim's 2 teen-aged brothers, there is no indication that anyone named Keith had access to this child during the relevant timeframe.

18

Throughout the course of this investigation, the victim's mother, Kristina MATTHYS, was asked to provide a list of all male individuals who had or may have had unsupervised contact with the victim within the seven days prior to the victim's doctor appointment where the semen was found. Kristina MATTHYS provided a list of all male individuals that had or may have had unsupervised contact with the child victim during the relevant time frame. Since the incident occurred during the summertime, the child was not in school and was supervised by her mother the majority of the time. The victim's mother does not work outside the home and is the primary caregiver for this victim. All individuals named by Kristina Matthys were blood related family members and Doug CROSEN. DNA samples were obtained from Kristina MA TIHYS and paternal grandmother Sandra MCDEVITT. When the DNA analysis was complete, Kristina MATTHYS and Sandra MCDEVITT'S DNA samples were compared to the known sample from the suspect. PTC Laboratories, 300 Portland Street, Columbia, Missouri 65201, independent from the Pennsylvania State Police Lab, was consulted, and compared the DNA profiles of Kristina MATTHYS and Sandra MCDEVITT to the suspect's DNA for familial testing. PTC Laboratories was able to confirm that the suspect DNA did not come from a blood related family member of the victim, did not come from a blood related family member of Kristina Matthys, and did not come from a blood related family member of Sandra McDevitt. Mr. Crosen is the only known male individual to have or may have had unsupervised contact with this victim within the relevant time frame that has not been definitively ruled out by DNA at this time. Numerous times the counsellor went through the individuals on the list provided by the victim's mother with the victim and asked her if any of the people on the list was the person who assaulted her and the victim would answer either no or I don't know.

According to Kristina Matthys, as well as the two male juveniles in the home (the victim's blood related brothers, who have both been ruled out by DNA as the perpetrators), there was no indication whatsoever of an intruder in or around their home during the relevant timeframe. The family advised they have large dogs that would have alerted them of an intruder.

On May 2, 2019, the victim's mother came to PSP to be interviewed regarding the list of people she had stated had or may have had unsupervised contact with the victim during the relevant timeframe. That interview is audio and video recorded. During that interview, the victim's mother recalled a conversation with the victim sometime around August of 2018 wherein the victim told her mother that the thing that happened occurred in the "bridal room", there was a wedding dress in the room without plastic on it, the victim was on the bed in the "bridal room" and the man took out his "boy parts" and put it in or on her girl parts. The victim again was unable or unwilling to name her perpetrator at that time.

In summary, the five-year-old victim is unwilling or unable, due to fear, to identify her assailant To date, the victim has not been able to directly identify her perpetrator. **However, RM has admitted to lying when she does not know what the adults want her to say. (Confidential Interview with RM, at 18:00).** However, the victim has been able to state that the male who did this did it in the bride/bridal room on the bed, took out his "boy parts" and put them in or on her "girl parts". The victim has been able to identify the bride/bridal room as being in the residence occupied by Doug CROSEN, the victim stated CROSEN is the one who told her about the bide/bridal room, and the victim has stated that CROSEN told her the bride/bridal room is where people go after they get married. The victim told her counsellor the person who did this is named "Keith" and stated "I know Doug's first name is Keith." In my experience, it is known that child victims of sexual assault often express fear in naming their perpetrator, especially when threats of harm are involved in the assault, and child molestation victims will often disclose the assault in fragments and/or indirectly so as to refrain from having to expose themselves to the promised retribution. Additionally, as outlined above, all other potential suspects other than CROSEN who had or may have had unsupervised contact with the victim during the relevant timeframe have been definitively ruled out by DNA testing. According to the victim's mother, the victim had unsupervised contact in CROSEN'S residence with Doug CROSEN during the relevant timeframe. According to the victim 's mother, CROSEN was the only male individual in that residence during the relevant time frame. ln my experience, it is known that child perpetrators often use ruses to lure a child and entice a child to not fear them or to intimidate the child into doing what the suspect wants the child to do. In this case, the victim disclosed that CROSEN showed her a room in his house that he identified as a "bride room." The victim further explained that CROSEN told her that the bride room is where people go after they get married, and there was a teddy bear in the bride room. The victim also disclosed the assault occurred in the bridal room. Wherefore, I respectfully request this search warrant be approved to obtain the DNA from Douglas George CROSEN, Jr.

(Omissions and corrections in **BOLD**).

Next, using the reconstructed affidavit, the Court must determine the materiality of the omitted and corrected information to the probable cause determination. *Round*, 2022 WL 2916681, at *16; *See Thompson*, 2024 WL 1747645, at *8. If a reasonable juror could conclude that the reconstructed affidavit lacks probable cause to arrest Crosen for the charges against him, Trooper Palmer is not entitled to qualified immunity. *Round*, 2022 WL 2916681, at *19.

When reviewing the reconstructed affidavit, all facts must be considered and conclusions made in favor of Crosen. *Reedy*, 615 F.3d at 216-19.

A reasonable juror could conclude that the reconstructed affidavit does not support a finding of probable cause to pursue charges against Crosen. "Probable cause exists if, at the moment the arrest was made, 'the facts and circumstances within the arresting officers' knowledge ... were sufficient to warrant a prudent man in believing that [suspect] had committed or was committing an offense.'" *Southerland v. Commonwealth*, 389 F. App'x 166, 168 (3d Cir. 2010) (quoting *Snell v. City of York*, 564 F.3d 659, 671 (3d Cir. 2009)) (cleaned up). "Evidence supporting probable cause need not be as strong as would be needed to support a conviction, and the officer need not make his determination based upon 'the fine resolution of conflicting evidence required at trial,' but there must at least be a 'fair probability' that a person committed the relevant crime." *Thompson*, 2024 WL 1747645, at *12 (quoting *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012) (cleaned up) & *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005)). When assessing whether a reconstructed affidavit establishes probable cause, statements of a victim witness are typically sufficient to establish probable cause unless there is "[i]ndependent exculpatory evidence or substantial evidence of [a] witness's own unreliability" that "outweigh[s]" the probable cause that otherwise exists. *Wilson*, 212 F.3d at 790; *see also Dempsey v. Bucknell Univ.*, 834 F.3d 457, 477-78 (3d Cir. 2016).

Relevant here, "[c]hild witnesses, [] especially those as young as five years-old, present a unique reliability issue for probable cause determination." *Round*, 2022 WL 2916681, at *16. While the Third Circuit has yet to address the issue of whether probable cause may be based solely on a child witness, "several other circuits have found that serious concerns exist when basing probable cause entirely on the uncorroborated statements of young children." *Round*,

2022 WL 2916681, at *16; *see United States v. Shaw*, 464 F.3d 615, 624 (6th Cir. 2006); *see also Stoot v. City of Everett*, 582 F.3d 910, 919–20 (9th Cir. 2009); *see also Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007). This is especially true when there is no corroborating evidence to support the child's narrative and when the child provides copious contradiction in their account of the crime. *Cf. Round*, 2022 WL 2916681, at *16.

However, even setting aside RM's age, the conflicting narratives RM provided Brust, Trooper Palmer, and Kristina about her abuse, as well as RM's admission to lying when she does not know what to say, serve as substantial evidence of RM's unreliability. *Wilson*, 212 F.3d at 790. "While 'some unreliability or exculpatory evidence will not fatally undermine probable cause' created by the statements of a victim witness," the probable cause that remains must outweigh the doubt the new evidence of unreliability breathes into the probable cause analysis. *Round*, 2022 WL 2916681, at *16 (quoting *Dempsey*, 834 F.3d 457, 477). Applying that balancing test to the facts at bar, when considering the reconstructed affidavit a reasonable juror could conclude "substantial evidence of [RM's] own unreliability" "outweigh[s]" the probable cause otherwise established by Trooper Palmer. *Wilson*, 212 F.3d at 789. In deciding so, the reasonable juror would be compelled to conclude Trooper Palmer did not have probable cause to prosecute Crosen. Accordingly, the Court finds Trooper Palmer is not protected by qualified immunity for Crosen's prosecutorial claims, as Crosen enjoys the clearly established right to be free from prosecution on criminal charges that lack probable cause. *Andrews v. Sculli*, 853 F.3d 690, 705 (3d Cir. 2017); *Donahue v. Gavin*, 280 F.3d 371, 379 (3d Cir. 2002); *Fallen*, 2023 WL 4118142 (denying summary judgment on all issues that involve a finding of probable cause where there remained a question of material fact as to whether, considering a reconstructed affidavit containing previously omitted

exculpatory information, probable cause survived); *Pinkney*, 95 F.4th at 749. (affirming the district court's denial of summary judgment on qualified immunity where "no reasonable officer would have covered up a lack of probable cause by recklessly disregarding the truth in an affidavit. . .  A reasonable officer thus would have known that [the officer's] alleged conduct was unlawful." (internal citation omitted)). Summary judgment is **DENIED** on this basis.

### 2.  Qualified Immunity for Reckless Investigation

The parties dispute the viability of Crosen's due process reckless investigation claim. Recognizing that the Third Circuit "has not specifically recognized a stand alone claim for reckless investigation," Crosen argues that he has a right to assert this claim because the Third Circuit has never held that the right to be free from reckless investigation does not exist. (Doc. 66, at 20). PSP Defendants assert that even if this is true, Trooper Palmer is entitled to qualified immunity because the Third Circuit has not recognized a clearly established right to be free from reckless investigation. (Doc. 52, at 13). The Court agrees with PSP Defendants.

Even if Crosen was able to show that PSP Defendants violated his due process right to be free from reckless investigation, "the viability of a stand-alone right to be free from a reckless investigation under the substantive due process clause is questionable at best." *Braunstein v. Paws Across Pittsburgh*, No. 2:18-CV-788, 2019 WL 1458236, at *10 (W.D. Pa. Apr. 2, 2019). While many district courts in this Circuit have recognized a stand-alone right to be free from a reckless investigation, there has been no recognition of such a claim by either the Third Circuit or the Supreme Court. In fact, in a footnote the Third Circuit has signaled that the right to be free from reckless investigation is not clearly established such that it

overcomes a claim for qualified immunity. *See Geness v. Cox*, 902 F.3d 344, 365 n.5 (3d Cir. 2018).

Considering the lack of Circuit or Supreme Court guidance, this Court concludes the right to be free from reckless investigation is not clearly established such that Crosen's claim may overcome qualified immunity. Trooper Palmer is therefore entitled to qualified immunity for Crosen's reckless investigation claim. *Atherton v. Shaffer*, No. CV 17-962, 2019 WL 1923040, at *3-4 (W.D. Pa. Apr. 30, 2019) (finding officers were entitled to qualified immunity for a reckless investigation claim because of the claim's "ill-defined contours.") Summary judgment will be **GRANTED** in PSP Defendants' favor on this issue. Count IV is **DISMISSED** from this action.

### B. Prosecutorial Claims

PSP Defendants claim that they are entitled to summary judgment on Crosen's malicious prosecution, false arrest, and false imprisonment claims because Trooper Palmer had probable cause to arrest Crosen. (Doc. 52, at 13). Crosen asserts that there was no probable cause to arrest him because Trooper Palmer "affirmatively distorted the truth, presented false testimony in her affidavit, and omitted material facts in the quest to arrest Crosen." (Doc. 66, at 14-15). Further, Crosen avers that "probable cause would not properly have been found if the [Magistrate Judge] would have been presented with an accurately drawn affidavit." (Doc. 66, at 16).

To state a claim for malicious prosecution, a plaintiff must satisfy the common law elements of the tort. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 792 (3d Cir. 2000). Thus, to prevail on a Fourth Amendment malicious prosecution claim, Crosen must allege "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3)

24

the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco,* 318 F.3d 497, 521 (3d Cir. 2003). A law enforcement officer may be liable for malicious prosecution where she "influenced or participated in the decision to institute criminal proceedings." *Halsey v. Pfeiffer,* 750 F.3d 273, 297 (3d Cir. 2014) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09, 317 (6th Cir. 2010). "The elements of a false-arrest claim are (a) that an arrest occurred; and (b) that the arrest was made without probable cause." *Brown v. Makofka*, 644 F. App'x 139, 143 (3d Cir. 2016); *see Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir.1995). "To succeed in a false imprisonment claim, a plaintiff must show that 'the police lack[ed] probable cause to make an arrest' and that the plaintiff was 'det[ained] pursuant to that arrest.'" *Lozano v. New Jersey*, 9 F.4th 239, 246 (3d Cir. 2021) (quoting *Harvard v. Cesnalis*, 973 F.3d 190, 202 (3d Cir. 2020)). Accordingly, the existence of probable cause is an absolute defense to malicious prosecution, false arrest, and false imprisonment. *See Givens v. Wal-Mart Stores, Inc.*, No. 22-2989, 2023 WL 7144628, at *2 (3d Cir. Oct. 31, 2023); *see also Andrews,* 853 F.3d at 697 (To assess claims of false arrest, the court must determine whether "the arresting officers had probable cause to believe the person arrested had committed the offense.").

   As discussed *supra*, the Court finds that when considering the reconstructed affidavit, a reasonable juror could conclude Trooper Palmer did not have probable cause to pursue charges against Crosen. Accordingly, summary judgment is inappropriate as to Crosen's malicious prosecution, false arrest, and false imprisonment claims. Summary judgment is

therefore **DENIED** as to all three claims: Count I, Count II, and Count III. *See Est. of Guziewicz v. Magnotta*, No. 3:14-CV-01742, 2019 WL 2868929, at *10-11 (M.D. Pa. July 3, 2019) (denying summary judgment on a malicious prosecution claim where a reasonable juror could conclude defendant lacked probable cause after looking at the reconstructed affidavit).

### C. EXCESSIVE BAIL

PSP Defendants assert that Trooper Palmer is entitled to summary judgment on Crosen's excessive bail claim because state troopers do not possess the authority to set bail and Crosen cannot show that Trooper Palmer manipulated the bond decision in his case. (Doc. 52, at 14). Crosen avers that his excessive bail claim is "not legally disputable" because the record shows Trooper Palmer provided false information to the magistrate to influence his bail decision. (Doc. 66, at 23, 25). Crosen also argues his claim survives because the record supports that Trooper Palmer requested Crosen be subject to "the highest bail possible." (Doc. 66, at 23, 25). The Court agrees with Crosen.

The Eighth Amendment forbids requiring excessive bail. U.S. CONST. amend. VIII. To assert a claim for excessive bail against a police officer, the plaintiff must demonstrate that the officer played a significant role in the Judge's decision to set an unreasonable bail. *See James v. York Cnty. Police Dep't*, No. CIV.A. 101CV1015, 2005 WL 1154500, at *5 (M.D. Pa. May 6, 2005) *aff'd*, 160 F. App'x 126 (3d Cir. 2005) (per curium). PSP Defendants are correct in their contention that in Pennsylvania, state troopers do not possess the authority to set bail. *See* Pa. R. Crim. P. 520 (granting the "bail authority" the power to set bail); *see also* Pa. R. Crim. P. 103 (defining the "bail authority" as magisterial district judges and other judges with jurisdiction over a case). However, as indicated by Crosen, it is still possible to allege a valid Eighth Amendment excessive bail claim against an individual that lacks authority to set bail

26

if the plaintiff demonstrates that the defendant manipulated the bond decision. *See James v. York Cnty. Police Dep't*, 160 F. App'x 126, 133 (3d Cir. 2005). Here, there remains a question of material fact as to whether Trooper Palmer influenced Crosen's bail decision.

In her deposition, Trooper Palmer admits that she attended Crosen's arraignment via video conference and that she requested "the highest bail possible." (Doc. 67-1, at 42). She also acknowledges that she was involved in a discussion about Crosen's family's wealth. (Doc. 67-1, at 42). Bail was subsequently set at one million dollars. (Doc. 67-1, at 42). The record therefore contains support from which a reasonable juror could conclude Trooper Palmer "did not merely arrest [Crosen] and then step aside, letting an independent judicial officer set bail." *Wagenmann v. Adams*, 829 F.2d 196, 212 (1st Cir. 1987). Accordingly, PSP Defendants' motion for summary judgment is **DENIED** as to Crosen's excessive bail claim, Count V.

D. SUPERVISORY LIABILITY & SOVEREIGN IMMUNITY

PSP Defendants argue that Colonel Evanchik is entitled to summary judgment on Crosen's claims for supervisory liability because "the Eighth Amendment broadly prohibits such claims; indeed, the Amendment broadly presents a constitutional limitation on the exercise of federal judicial power under Article III." (Doc. 52, at 14). PSP Defendants also argue that sovereign immunity "bars actions for retrospective relief by private persons against state officials for actions taken in the official's official capacity." (Doc. 52, at 15). Crosen refutes PSP Defendants' understanding of his claims, clarifying that PSP Defendants are each being sued in their individual capacity, not their official capacity. (Doc. 66, at 26-27). Accordingly, Crosen maintains sovereign immunity does not apply in this case. (Doc. 66, at 27). The Court agrees.

27

Under the Eleventh Amendment, states and state actors acting in their official capacity are granted sovereign immunity and are generally barred from suit by private actors in federal court. *See Board of Tr. of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001). To sue a state actor, a plaintiff must therefore allege claims against the state actor in their personal capacity, not their official capacity. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). To determine whether a state actor is being sued in their official or personal capacity, courts look to the complaint and subsequent proceedings. *Atwell v. Schweiker*, 274 F. App'x 116, 118 (3d Cir. 2007) ("To determine whether a plaintiff sued a defendant in his personal capacity, official capacity, or both, we look to the complaint and the course of proceedings.").

Crosen makes clear in his Complaint that he is suing PSP Defendants in their individual capacities, not their official capacities. (Doc. 1, ¶ 16). As there is no official capacity claim at issue in this case, sovereign immunity is irrelevant. The Court therefore finds that Colonel Evanchick is not entitled to sovereign immunity for the claims asserted against him in his individual capacity. Summary judgment is **DENIED** as to Count VI on this basis.[4] *See Hall v. Phelps*, No. 22-CV-480, 2024 WL 1052894, at *6 (M.D. Pa. Mar. 11, 2024) ("Regardless of whether Evanchick's action were in the scope of his employment, sovereign immunity does not apply here because Plaintiffs have sued Evanchick in his personal capacity. Accordingly,

---

[4] Without citing to the complaint, the record, or any caselaw, PSP Defendants argue that "The only allegations regarding Evanchik pertain to his alleged role as a "policymaker" in the development and enactment of the 'potential policy or custom' which 'resulted in' the complained injury. Because this is an official capacity claims [sic], it is barred by the sovereign immunity afforded by the Eleventh Amendment—even assuming, arguendo a claim could exist against Palmer." (Doc. 52, at 15-16). Without more specificity, including citations to relevant portions of the pleadings, this Court cannot conclude that, despite his assertion otherwise, Crosen only alleges claims against Evanchik in his official capacity.

Evanchick is not entitled to sovereign immunity from Plaintiffs' supervisory liability claim against him.").

## IV.   CONCLUSION

Based on the forgoing, PSP Defendants' motion for summary judgment is **DENIED in part** and **GRANTED in part**. (Doc. 50). PSP Defendants' motion is **DENIED** as to Count I, Count II, Count III, Count V, and Count VI, as well as to the defenses of qualified immunity and sovereign immunity. PSP Defendants' motion is **GRANTED** as to Count IV. Count IV is **DISMISSED** from this action.

An appropriate Order follows.


**Dated: July 15, 2024**                    *s/ Karoline Mehalchick*
                                             **KAROLINE MEHALCHICK**
                                             **United States District Judge**